UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PATRICK SANDER,

                              Plaintiff,

     - against -

CITY OF MOUNT VERNON, *et al.*,

                             Defendants.
-------------------------------------------------------------x

**OPINION & ORDER ON
MOTION TO DISMISS**

No. 23-CV-6204 (CS)

Appearances:

Patrick Sander
Albany, New York
*Pro Se Plaintiff*

Steven J. Bushnell
The Quinn Law Firm, PLLC
White Plains, New York
*Counsel for Defendant City of Mount Vernon*

Loren Zeitler
Associate County Attorney
White Plains, New York
*Counsel for Defendants County of Westchester, Westchester County Department of Social
Services and Westchester Department of Corrections*

Seibel, J.

     Before the Court are the motions to dismiss of Defendant City of Mount Vernon ("the

City" or "Mount Vernon"), and Defendants Westchester County ("the County"), the Westchester

County Department of Corrections and the Westchester County Department of Social Services.

(ECF Nos. 57, 62).  For the reasons set forth below, the motions are granted.

I.      **BACKGROUND**

     For the purposes of the instant motions to dismiss, I accept as true the facts, but not the

conclusions, set forth in Plaintiff's original Complaint, (ECF No. 1 ("Compl.")), Amended

Complaint, (ECF No. 8 ("AC")), and Second Amended Complaint, (ECF No. 53 ("SAC")). *See*

*Voltaire v. Westchester Cnty. Dep't of Soc. Servs.*, No. 11-CV-8876, 2016 WL 4540837, at *3

(S.D.N.Y. Aug. 29, 2016) ("[A] court is permitted to consider factual allegations in *pro se*

plaintiff['s] preceding complaints in order to supplement those in amended complaints."); 

*Washington v. Westchester Cnty. Dep't of Corr.*, No. 13-CV-5322, 2015 WL 408941, at *1 n.1

(S.D.N.Y. Jan. 30, 2015) (court may give *pro se* plaintiff the benefit of considering facts in

original complaint even if they have not been repeated in amended complaint).[1]

A.    **Facts**

1.    **Plaintiff's Arrests**

On July 27, 2020, Plaintiff Patrick Sander was arrested at his home by the Mount Vernon

Police Department ("MVPD").  (Compl. at 3.)  After Plaintiff responded to a knock on his door,

non-defendant Officer Patterson "barged through [the] door and immediately arrested [him]"

using handcuffs after a man named Rodney Failes accused Plaintiff of assault.  (*Id.*)  Failes

"pointed at [Plaintiff] and said [Plaintiff] assaulted him," but Plaintiff says this accusation was

false.  (*Id.*)  Plaintiff says that he told Officer Patterson that Failes was the one who assaulted

Plaintiff.  (*Id.*)  Plaintiff was left with a bloodied and broken nose because of the assault, and

MVPD officers arrested him in reliance on Failes's allegations, not their own observations.  (*Id.*

at 6.)  As Plaintiff was being arrested, he informed Officer Patterson that he had a one-year-old

son upstairs, who was left unattended when Plaintiff was put into the back of a police car.  (*Id.* at

---

[1] The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion. Unless otherwise indicated, case quotations omit internal quotation marks, citations, footnotes and alterations.  Citations to Plaintiff's original Complaint and AC use the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system, and citations to Plaintiff's SAC use the paragraph numbers as they appear in the document.

3.)  The MVPD called Child Protective Services ("CPS") "to open an investigation on [Plaintiff]."  (*Id.*)

In September 2020, Plaintiff was again arrested by MVPD officers.  (*See id.* at 4.) Plaintiff says in his original Complaint that a nurse at Jacobi Medical Center in the Bronx accused him of assaulting his mother after he had dropped her off at the hospital.  (*Id.* at 4, 6.) He alleges that the New York City Police Department ("NYPD") referred the case to the MVPD, and the next day SWAT officers surrounded Plaintiff's house and arrested him.  (*Id.* at 4.)  But he also alleges that his second arrest resulted from an ongoing Adult Protective Services ("APS") investigation into the care of his mother that began in June 2020.  (Compl. at 4, 8; SAC ¶ 10.) Confusingly, Plaintiff also says that his second arrest, and the criminal charges against him, stemmed from a CPS investigation.  (SAC ¶ 11.)  In his AC, Plaintiff refers to an investigation that resulted in his incarceration and a CPS case that led to an order of protection and his separation from his newborn son, although it is not clear when that occurred or whether it related to his first or second arrest.  (AC at 1, 2.)

As to his second arrest, Plaintiff says that the charges were commenced through a "secret indictment" that his assigned counsel allegedly helped to procure and that was returned before the felony hearing he had requested at his arraignment.  (SAC ¶¶ 10-14; AC at 1-2; Compl. at 4, 7-8.)  He alleges that a Westchester County District Attorney involved in the case knew that Plaintiff's mother had dementia and "coerced a false statement" from her to prosecute the case. (Compl. at 7.)  Plaintiff also claims that the District Attorney "saw an opportunity to prosecute a case against a defendant with a criminal history and thought this would be an open and shut case."  (AC at 1-2; *see* SAC ¶ 15.)

3

Charges from both arrests were ultimately dismissed pursuant to New York Criminal Procedure Law § 30.30.  (Compl. at 5; SAC ¶ 17.)  That statute provides the time within which prosecutors bringing criminal charges in New York must be "ready for trial."  N.Y. Crim. Proc. Law § 30.30 (McKinney 2025).  Plaintiff also alleges that the assigned prosecutor in his case was later fired "when it became apparent the case was failing."  (SAC ¶ 19.)

### 2.    Plaintiff's Confinement

During his intake at the Westchester County Jail ("the Jail"), Plaintiff was subjected to COVID-19 screening procedures.  (*Id.* ¶ 22.)  Although it is unclear whether it was upon his September 24 intake or sometime in October, Plaintiff was required to take a COVID-19 test via a nasal swab.  (SAC ¶¶ 22, 25; AC at 2; Compl. at 4.)  Plaintiff says that he refused and instead requested an alternative testing method, specifically a blood draw, to test for COVID.  (SAC ¶ 25; AC at 3.)  Blood testing was allegedly available, but he was denied the alternative due to "cost concerns."  (SAC ¶ 26.)  Plaintiff says that Jail "administration stated that the cost [of a blood test] would be to[o] demanding."  (AC at 3.)  Plaintiff was placed into a separate section of the Jail for "administrative/medical" isolation.  (SAC ¶ 27.)

Plaintiff alleges that he was supposed to be under an observational hold, but that after a standard fourteen-day quarantine period, he was not allowed to rejoin the general population.  (SAC ¶ 30; AC at 2-3; Compl. at 4.)  Instead, Plaintiff says he remained in a medically segregated section of the Jail full-time for up to eight months.  (*See* Compl. at 4.)[2]  But Plaintiff

---

[2] The exact length is unclear.  In his original complaint, Plaintiff says that the medical separation was from October 2020 to April 2021, which may be six or seven months depending on when the isolation began and ended.  (*See* Compl. at 4.)  But Plaintiff also claims that it was seven to eight months in isolation.  (*Id.*)  Plaintiff does not repeat this allegation in his later complaints, only stating in his SAC that his separation was "for an extended period beyond any medically necessary quarantine period."  (SAC ¶ 27.)  Drawing all reasonable inferences in

"never showed any signs of COVID."  (AC at 3.)  Plaintiff contends that this placement was meant to punish him for his having refused to take a nasal swab and requesting a more costly blood test.  (SAC ¶¶ 29, 52; AC at 3; Compl at 8.)  Plaintiff sent several complaints using the Jail's grievance procedures, but his requests went unanswered.  (SAC ¶¶ 31-32; AC at 3; Compl. at 4.)  In his complaints, Plaintiff requested a review of his housing placement, but no "meaningful review of his segregation status" ever occurred.  (SAC ¶¶ 31-32.)  Plaintiff also says he wrote to the Commissioner of the Westchester County Department of Corrections and the County Executive.  (AC at 3; Compl. at 4.)

Plaintiff "suffers from [b]ipolar, [m]anic [d]epression, and [a]nxiety," and the prolonged isolation in a six-by-nine cell had an adverse effect on Plaintiff.  (Compl. at 8.)  He states that he informed the Jail's mental health staff, but it is unclear whether he means that he informed them of a preexisting mental health condition or of his placement's effect on him.  (*Id.*)  In his SAC, however, Plaintiff alleges that he "[d]evelop[ed] . . . bipolar manic depression" as a result of Defendants' constitutional violations.  (SAC ¶ 61.)  Plaintiff also says that he suffered from "[p]hysical deterioration including malnutrition and persistent back pain" and a "[l]oss of access to adequate medical care during segregation."  (*Id.*)  Plaintiff further says that he had no access to the Jail's law library or religious services; was separated from his child; missed his mother's death; and suffered lost income, social security benefits and other economic losses as a result of his incarceration.  (*Id.*)

---

Plaintiff's favor at this stage of the ligation, and given his *pro se* status, I will assume for purposes of the motions that the length of medical quarantine was up to eight months.  *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (courts "are obligated to draw the most favorable inferences that [*pro se* plaintiff's] complaint supports").

About a day before Plaintiff was released from the Jail, he was administered a COVID test via a blood draw that returned to a negative result. (*Id.* ¶ 34.) Plaintiff says the timing of the blood test, one day before his release, demonstrates that the Jail's staff had the ability to provide the blood test throughout his medical segregation but chose not to give him one. (*Id.* ¶ 35.)

### B.   **Procedural History**

Plaintiff initiated this action on July 18, 2023. (ECF No. 1.) By order dated August 7, 2023, Chief Judge Swain granted Plaintiff's request to proceed *in forma pauperis* ("IFP") – that is, without prepayment of fees. (ECF No. 3.) She also reviewed his complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998), and by order dated May 6, 2024, dismissed Plaintiff's claims against the MVPD, the Westchester County Department of Corrections, the Westchester County Department of Social Services, Westchester County Adult Protective Services, Westchester County Child Protective Services, Jacobi Medical Center and the New York City Police Department for failure to state a claim, on the ground that none were entities capable of being sued under 42 U.S.C. § 1983. (ECF No. 5.) Chief Judge Swain also noted that Plaintiff did not allege facts sufficient to state his claims and granted Plaintiff leave to amend. (*Id.*) Plaintiff filed his AC on September 3, 2024, (ECF No. 8), and the case was reassigned to me on September 17, 2024.

By order dated September 18, 2024, I dismissed the Westchester County Department of Corrections as a party and directed the Clerk of Court to substitute the County of Westchester as a defendant. (ECF No. 10.) I also directed the Clerk of Court to add as individual defendants "John Does 1-10" and further directed the City to identify all police officers involved with the events alleged in the AC, (*id.*), which the City did on November 18, 2024, (ECF No. 19). The City also requested that Plaintiff be compelled to authorize its counsel to have access to the

6

sealed records from his criminal proceedings, pursuant to New York Criminal Procedure Law § 160.50, (*id.*) – authorization which, after follow-up orders over several months, (*see* ECF Nos. 21, 25, 27-28), Plaintiff ultimately provided, (*see* ECF Nos. 31-32).  Plaintiff was permitted to file a SAC, if he chose, after receiving the unsealed documents.  (*See* ECF Nos. 35, 39, 41.) Additionally, Plaintiff sought discovery from the County after his Freedom of Information Law ("FOIL") request was denied, which the County brought to my attention via letter dated April 14, 2025.  (*See* ECF No. 42.)  On April 15, 2025, I denied Plaintiff's request for discovery as premature and ordered Plaintiff to file his SAC by May 13, 2025.  (ECF No. 44.)  After Plaintiff did not file a SAC, Defendants filed pre-motion letters in anticipation of their motions to dismiss. (ECF Nos. 45, 48.)

On June 26, 2025, the Court held a pre-motion conference, at which I granted Plaintiff one last opportunity to submit his SAC by August 25, 2025, and set a briefing schedule.  (*See* Minute Entry dated June 26, 2025.)  Plaintiff later requested via letter dated August 10, 2025 that I order Westchester County to respond to Plaintiff's FOIL requests, which I denied on August 14, 2025 because federal courts do not have jurisdiction to enforce requests for information under state FOIL statutes.  (*See* ECF Nos. 51-52.)  On September 10, 2025, Plaintiff filed his SAC, (ECF No. 53), and the instant motions followed on October 10, 2025, (ECF No. 57, 62.) Pursuant to a revised briefing schedule, Plaintiff was to file his opposition to Defendants' motions by November 10, 2025.  (ECF No. 56.)  In a letter dated October 30, 2025, Plaintiff again sought records pursuant to FOIL from the County, requesting that I order Defendants to produce the documents and that I defer ruling on Defendants' motions (which were motions to dismiss but which he characterized as motions for summary judgment).  (ECF No. 68.)  I denied Plaintiff's request and explained that Defendants had filed motions to dismiss, which I did not

intend to convert into summary judgment motions, but that Defendants may have submitted documents of which I could take judicial notice. (*Id.*)  Plaintiff did not submit an opposition by the deadline. (*See* ECF No. 70.)  In light of his *pro se* status, I granted Plaintiff an extension to oppose the motions or explain why he should be given more time. (*Id.*)  Plaintiff failed to file an opposition by the extended date.

## II.      LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Complaints by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*).  Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## III.    DISCUSSION

Although courts typically deem a claim abandoned where a plaintiff fails to respond to a defendant's argument that the claim should be dismissed, a *pro se* plaintiff's failure to oppose a motion to dismiss does not require dismissal.  *See Wilkinson v. N.Y. State*, No. 18-CV-4148, 2019 WL 5423573, at *6 n.9 (E.D.N.Y. Oct. 22, 2019); *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-6670, 2019 WL 4039958, at *3 n.4 (S.D.N.Y. Aug. 27, 2019); *Colon v. Annucci*, 344 F. Supp. 3d 612, 628 (S.D.N.Y. 2018).  Accordingly, I will address the merits of Defendants' motions.

### A.    Municipal Liability/Personal Involvement

The only Defendants named are the City, the County and its agencies, and ten John or Jane Does.  (SAC ¶¶ 4-8.)  Despite having been provided with the names of the officers involved

in his arrests, (ECF No. 19), Plaintiff has not named any of them as Defendants.  Nor has he named any official of the Jail.

"To hold a [municipal defendant] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007).

> To allege such a policy or custom, the plaintiff may assert:  (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at \*15 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014).  "[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details."  *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at \*13 (S.D.N.Y. Mar. 26, 2015).  Additionally, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."  *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998).

Plaintiff alleges the existence of certain policies of the County, (SAC ¶¶ 57-60), but those allegations are entirely conclusory, with no facts rendering the existence of such policies plausible.  This alone justifies dismissal of Plaintiff's claims.  *See Martin v. County of Nassau*, 692 F. Supp. 2d 282, 296 (E.D.N.Y. 2010) (dismissing where "allegations of municipal custom or policy are entirely conclusory," with no facts supporting existence of custom or policy of

violating individuals' rights, "except for facts pled in connection with the alleged violation of [plaintiff's] own rights," which does not suffice).  Moreover, as set forth below, Plaintiff fails to plausibly allege any constitutional violation, and thus his claims of *Monell* liability similarly fail, because absent an underlying constitutional violation, there can be no *Monell* liability for a municipality.  *See, e.g.*, *Fappiano v. City of N.Y.*, 640 F. App'x 115, 121 (2d Cir. 2016) (summary order); *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013); *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006).  Having only named municipalities as Defendants, and having failed to provide facts on which municipal liability could be founded, Plaintiff's claims are dismissed.[3]

Nevertheless, in light of Plaintiff's *pro se* status, I address the claims in an excess of caution.

B.    **Malicious Prosecution & False Arrest Claims**

In original Complaint, Plaintiff asserted claims under § 1983 for false arrest in connection with his July 2020 and September 2020 arrests, and malicious prosecution stemming from his September 2020 arrest.  (Compl. at 6-8.)  Plaintiff continues to assert his malicious prosecution claim, (AC at 1-2; SAC ¶¶ 9-20, 36-40), but he appears to have abandoned his false arrest claims in the SAC.  Still, I will address both claims in light of his *pro se* status.

---

[3] Even if Plaintiff had named any individual as a defendant, his claims would fail.  To state a claim under § 1983, a plaintiff must allege facts showing the defendant's direct and personal involvement in the alleged constitutional deprivation.  *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.")  Apart from identifying an Officer Patterson as the officer who arrested him the first time, Plaintiff has not provided any information specifying anything that any other individual allegedly did.  And as explained below, Patterson would not have any liability.

### 1.    False Arrest

A claim for false arrest under § 1983 is essentially the same as a false arrest claim under New York law. *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025). "To establish a false arrest claim under New York law, a plaintiff must adequately allege (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* An arrest is otherwise privileged, and thus there is no claim, if there was probable cause to arrest. *Whitson v. Gilberg*, 792 F. Supp. 2d 639, 643 (E.D.N.Y. 2011). Thus, "[u]nder both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Triolo v. Nassau County*, 24 F.4th 98, 106 (2d Cir. 2022). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Whether probable cause to arrest exists depends on the totality of the circumstances, considering both the exculpatory and inculpatory evidence available to the officer at the time of arrest and immediately before it. *Triolo*, 24 F.4th at 106. Unless there is reason to doubt the statements of an alleged victim of a crime, probable cause may be established where an arresting officer relies on statements from the alleged victim that identify an individual as the perpetrator. *See id.*; *Betts*, 751 F.3d at 82; *Rodriguez v. New York*, No. 95-CV-3639, 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996) (collecting cases).

Based on the totality of the circumstances, MVPD officers had probable cause to arrest Plaintiff in July 2020, so Plaintiff's claim in connection with that arrest fails. Plaintiff alleges that Officer Patterson arrested him because Rodney Failes identified Plaintiff as the perpetrator

of an assault against Failes.  (Compl. at 3.)  Plaintiff claims that he told the police that he was the victim of the assault, but he alleges no facts plausibly suggesting that Patterson or other MVPD officers had reason to doubt Failes's identification.  (*See id.* at 3, 6.)  Officers have no duty to explore or eliminate an arrestee's claims of innocence.  *See Martinsky v. City of Bridgeport*, 504 F. App'x 43, 46 (2d Cir. 2012) (summary order) ("[P]olice officers are not required conclusively to eliminate all alternative explanations offered by a suspect where the evidence reasonably indicates that the suspect may have committed a crime."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) (law enforcement officers are tasked with "apprehend[ing] those suspected of wrongdoing," not engaging in "a weighing of the evidence"); *Butler v. Sampognaro*, No. 18-CV-545, 2019 WL 3716595, at *3 (D. Conn. Aug. 7, 2019) ("[P]robable cause does not necessarily disappear simply because an innocent explanation may be consistent with facts that an officer views as suspicious, and officers are not required to accept a suspect's account on faith but are entitled to weigh the suspect's explanation against the facts on the other side of the ledger.").

That Plaintiff was injured in the alleged altercation with Failes does not suffice to show that the officers acted unreasonably in arresting Plaintiff.  That both parties to an altercation were hurt hardly suggests that one of them did not initiate the assault.  And "in similar circumstances involving conflicting accounts of who was at fault in a fight, [courts] have found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee." *Shen v. City of N.Y.*, 725 F. App'x 7, 13 (2d Cir. 2018) (summary order).  Even if Failes was lying, that would not vitiate probable cause.  *See Aberra v. City of N.Y.*, No. 21-1992,

2023 WL 221096, at *1 (2d Cir. Jan. 18, 2023) (summary order) ("[E]ven if the witnesses'

statements turned out to be inaccurate, probable cause exists even where it is based upon

mistaken information, so long as the arresting officer was reasonable in relying on that

information."); *Finnegan v. Berben*, No. 20-CV-10231, 2024 WL 1242996, at *14 (S.D.N.Y.

Mar. 22, 2024) (to the same effect); *Morris v. City of N.Y.*, No. 15-CV-3121, 2017 WL 3588941,

at *4 (S.D.N.Y. Aug. 18, 2017) (probable cause existed where officer reasonably relied on

information from eyewitness and had no reason to doubt that witness was telling the truth);

*Fudge v. Town of Shandaken Police*, No. 09-CV-300, 2010 WL 3258385, at *3 (N.D.N.Y. Aug.

16, 2010) (officers have probable cause even if information used as basis of arrest is mistaken as

long as reliance was reasonable, which it is if officer received information from eyewitness).

Plaintiff therefore does not plausibly allege that probable cause was lacking in his July 2020

arrest.

Similarly, MVPD officers had probable cause to arrest Plaintiff in September 2020.

Plaintiff alleges that MVPD officers arrested him after a nurse and Jacobi Medical Center

reported to the NYPD that he had assaulted his mother and that information was passed on to the

MVPD.  (Compl. at 4, 6.)[4]  None of Plaintiff's allegations suggest that MVPD officers had

reason to believe that any of the information that they received from the NYPD was false.

"When making a probable cause determination, police officers are entitled to rely on the

allegations of fellow police officers."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *see*

*United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("[A]n arresting officer might not be

aware of all the underlying facts that provided probable cause or reasonable suspicion, but may

---

[4] Neither the AC nor the SAC contains any additional or different facts as to the involvement of the MVPD in his September 2020 arrest.

nonetheless act reasonably in relying on information received by other law enforcement officials."); *Walston v. City of N.Y.*, 289 F. Supp. 3d 398, 408 (E.D.N.Y. 2018) (officer defendant correctly determined he had probable cause to arrest based in part on another officer's complaint report); *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 577 (S.D.N.Y. 2002) ("A police officer is entitled to rely on the contents of a fellow officer's radio report and to presume that a statement alleging criminality is justified by probable cause.").  Nor has Plaintiff suggested any reason the officers would have had to doubt a report from a hospital nurse treating the victim.  That the police or the nurse did not personally witness the assault hardly suggests that there was no evidence that it occurred.  Thus, Plaintiff's allegations are not sufficient to plausibly infer either that MVPD officers lacked probable cause in making the arrest or that their reliance on the information they received was unreasonable.

Accordingly, to the extent Plaintiff still pursues false arrest claims against MVPD officers, those claims are dismissed.

### 2.    Malicious Prosecution

Moving to Plaintiff's malicious prosecution claim in connection with his September 2020 arrest, a § 1983 claim for malicious prosecution is substantially the same as a claim for malicious prosecution under New York law.  *See Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025).  To state a claim for malicious prosecution under New York law, a plaintiff must show:  "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions."  *Dettelis v. Sharbaugh*, 919 F.3d 161, 163-64 (2d Cir. 2019).

15

Plaintiff's malicious prosecution claim fails to the extent it can be construed against any MVPD officer because he does not plausibly suggest that MVPD officers lacked probable cause. As with a false arrest claim, probable cause is a complete defense to a malicious prosecution claim. *See Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). "[P]robable cause to prosecute is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Johnson v. City of N.Y.*, No. 20-CV-3083, 2022 WL 6564685, at *11 (S.D.N.Y. Aug. 12, 2022), *report and recommendation adopted*, 2022 WL 4364879 (S.D.N.Y. Sept. 21, 2022), *aff'd*, No. 22-2096, 2023 WL 3607219 (2d Cir. May 24, 2023) (summary order). Although probable cause to prosecute is distinct from probable cause to arrest, "where probable cause to arrest exists and there are no intervening facts between arrest and initiation of prosecution to undermine that probable cause, claims of malicious prosecution cannot survive." *Caraballo v. City of N.Y.*, 726 F. Supp. 3d 140, 160 (E.D.N.Y. 2024), *on reconsideration in part sub nom. Caraballo v. Surriga*, No. 21-CV-285, 2024 WL 2701644 (E.D.N.Y. May 24, 2024); *see Powell v. Murphy*, 593 F. App'x 25, 28 (2d Cir. 2014) (summary order) (malicious prosecution claim failed where plaintiff does not allege that defendant learned of "any intervening facts between arrest and initiation of prosecution to undermine . . . probable cause"). As previously noted, MVPD officers had probable cause to arrest Plaintiff, and Plaintiff does not allege MVPD officers learned of any new facts between his arrest and the initiation of his prosecution that would undermine that probable cause. Accordingly, Plaintiff's malicious prosecution claim against MVPD officers fails for similar reasons as his false arrest claims.

Plaintiff's claim also fails against any MVPD officer because he does not allege that any officers were involved in the initiation or prosecution of his case after his arrest. It is the district

16

attorney who decides whether or not to prosecute once an arrest is made.  *See Toussaint v. County of Westchester*, 615 F. Supp. 3d 215, 227 (S.D.N.Y. 2022).  "While police officers do not generally [initiate] criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer . . . play[ed] an active role in the prosecution, such as [by] giving advice and encouragement . . . ."  *Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015).  An officer may also be liable if he "creates false information likely to influence a jury's decision and forwards that information to prosecutors, or withholds relevant and material information from the prosecutor."  *Barone v. United States*, No. 12-CV-4103, 2014 WL 4467780, at *17 (S.D.N.Y. Sept. 10, 2014).  Here, Plaintiff does not allege that MVPD officers actively participated in his prosecution, nor does he allege that they withheld information or shared false information with prosecutors.  Plaintiff also does not say that MVPD officers played any role in the alleged coercion of his mother, and it is not plausible to infer as much from his conclusory allegation of the coercion.  (*See* Compl. at 7.)  Plaintiff's allegations therefore are insufficient to state a plausible malicious prosecution claim against any MVPD officer.

Next, to the extent that Plaintiff's malicious prosecution claim could be construed as a claim against any employee of the County or the City for the initiation of child or adult protective services investigations into Plaintiff's care of his child or mother, Plaintiff's claim would fail.  The Second Circuit has never held that initiation of child-removal proceedings can serve as the basis for a malicious prosecution claim.  *Stollman v. Williams*, No. 23-7610, 2025 WL 2784215, at *4 (2d Cir. Sept. 30, 2025) (summary order); *see Emerson v. City of N.Y.*, 740 F. Supp. 2d 385, 392 (S.D.N.Y. 2010) (neglect and abuse proceedings in Family Court did not implicate Fourth Amendment rights and thus could not support malicious prosecution claim).

17

*But see V.A. v. City of N.Y.*, No. 22-CV-773, 2023 WL 6254790, at *7 (S.D.N.Y. Sept. 26, 2023) (Second Circuit law is unsettled but "the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim."). Because there is no prior case law clearly establishing that such proceedings can support a malicious prosecution claim, any individual defendant would be entitled to qualified immunity in any event. *Stollman*, 2025 WL 2784215, at *4.

But assuming such a proceeding could sustain a claim for malicious prosecution independent of the criminal proceedings against Plaintiff, and assuming a proper defendant had been named, a malicious prosecution claim would fail. As an initial matter, nowhere does Plaintiff allege that the CPS or APS proceedings (as opposed to the criminal proceedings) were dropped or dismissed or otherwise terminated in his favor. Further, he fails to allege any facts plausibly suggesting that a County or City employee acted with malice in initiating the protective proceedings. Nowhere in Plaintiff's complaints does Plaintiff allege that either the adult or child protective services investigation – independent of the criminal proceedings against him – began due to "a wrong or improper motive, [or] something other than a desire to see the ends of justice served." *See Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994). If anything, Plaintiff's allegations instead suggest a proper purpose: that MVPD officers called CPS after Plaintiff was arrested and his son was at home alone, (*see* Compl. at 3), and that APS got involved after a report from a medical provider, (*see id.* at 4, 6). As a result, Plaintiff does not plausibly state a malicious prosecution claim to the extent it is based on the initiation of any child or adult protective services investigation or proceedings. *See Johnson*, 2022 WL 6564685, at *13 ("[P]laintiff freely sprinkles the words 'malice' and 'malicious' throughout his pleading but

18

offers no concrete facts or non-speculative allegations that would suggest that the ACS caseworkers involved with [Plaintiff's] family acted out of any improper or ulterior motive.").

To the extent Plaintiff's claim is intended to be levied against a County Assistant District Attorney ("ADA") based on the criminal prosecution, it also fails, because, for the same reasons discussed with respect to the MVPD officers, probable cause existed.[5] In addition, "[a]bsolute prosecutorial immunity covers acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial," including the presentation of evidence to a grand jury. *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 378 (S.D.N.Y. 2021). "A prosecutor's absolute immunity extends, among other things, to deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." *Sandy v. City of N.Y.*, No. 13-CV-6118, 2013 WL 6572537, at *2 (E.D.N.Y. Dec. 13, 2013), *appeal dismissed*, No. 14-697, 2014 WL 12971966 (2d Cir. July 10, 2014). Courts may consider absolute immunity at the motion to dismiss stage where the facts establishing the defense appear on the face of the complaint. *Buari*, 530 F. Supp. 3d at 378.

---

[5] Ordinarily, "indictment by a grand jury creates a presumption of probable cause" for a malicious prosecution claim, and "[t]hat presumption may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello v. City of N.Y.*, 612 F.3d 149, 162 (2d Cir. 2010). Plaintiff alleges in wholly conclusory fashion that the ADA "kn[ew] that [his] mother suffered from d[e]mentia and needed public assistance, [and] used her influence to coerce a false statement from [his] mother." (Compl. at 7.) Because there are no facts rendering that conclusion plausible, I need not credit it. But in any event, Plaintiff does not allege that this allegedly coerced statement (the content of which is not specified) was necessary for the grand jury to return an indictment or that probable cause was otherwise lacking without it – which alone could be fatal to his claim, given that Plaintiff alleges a nurse and hospital reported the assault. (*See id.* at 4, 6.) But I will assume for purposes of a potential claim against an unnamed ADA that a coerced statement would rebut the existence of probable cause supporting the grand jury indictment.

19

The County does not address this issue – perhaps understandably, given the lack of clarity in the SAC.  But even assuming that Plaintiff's bald assertion of coercion is true, the ADA would still be immune from liability because she was functioning in her role as advocate for the state.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 272-73 (1993).  Plaintiff's allegations do not raise any inference suggesting that the ADA was acting outside her role as a County prosecutor – such as by conducting a "preliminary investigation of an unsolved crime," *id.* at 275 – at the time that she allegedly procured this statement.  Instead, using a coerced statement to secure an indictment before a grand jury, as is alleged here, is the type of action for which the ADA would be immune as a prosecutor.  *See Williams v. County of Onondaga*, No. 22-CV-1367, 2023 WL 2563181, at *6 (N.D.N.Y. Feb. 21, 2023) (ADA's "efforts to pursue the charges against plaintiff and prepare witnesses for testimony before the grand jury would fall within his prosecutorial functions and would be protected by absolute immunity"), *report and recommendation adopted*, 2023 WL 2563210 (N.D.N.Y. Mar. 16, 2023).  And, in any event, the claim of knowing coercion of Plaintiff's mother is entirely conclusory, with no facts provided that would render it plausible.

Accordingly, Plaintiff's malicious prosecution claim is dismissed.

### C.    "Felony Hearing"

In Plaintiff's original Complaint, he alleges a denial of his due process rights because he was denied a "felony hearing" after his September 2020 arrest.  (Compl. at 4, 6-7.)  Plaintiff's AC and SAC also refer to his request for a "felony hearing" that was denied.  (AC at 1; SAC ¶¶ 13-14.)

Plaintiff's claim fails for at least two reasons.  First, even if Plaintiff could bring a § 1983 claim for his denial of a preliminary hearing, the individual defendant against which Plaintiff

20

could bring the claim would be the prosecutor, who would be immune from suit, *see Reeder v. Dennis*, No. 20-CV-6026, 2020 WL 5098352, at *4 (W.D.N.Y. Aug. 24, 2020) (denying plaintiff preliminary hearing is action that "falls squarely within a prosecutor's traditional prosecutorial activities"), or perhaps the judge, who would likewise be absolutely immune, *see Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) ("It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."). Second, there is no constitutional right to a preliminary hearing, *Sciortino v. Zampano*, 385 F.2d 132, 134 (2d Cir. 1967); *Walker v. City of Buffalo,* No. 22-CV-520, 2025 WL 828242, at *4 (W.D.N.Y. Mar. 17, 2025), and there is no constitutional violation where, as here, a complaint is superseded by an indictment before the hearing is held, *see, e.g.*, *Sain v. Capra*, No. 15-CV-5315, 2021 WL 6808294, at *7 (S.D.N.Y. Aug. 19, 2021), *report and recommendation adopted*, 2022 WL 203180 (S.D.N.Y. Jan. 24, 2022); *Kearney v. N.Y. State Legislature*, 103 F.R.D. 625, 629-30 (E.D.N.Y. 1984).[6] In the absence of a violation of a federal right, no § 1983 claim lies.

Accordingly, Plaintiff's due process claim related to his denial of a "felony hearing" is dismissed.

### D.       Substantive Due Process Claim

Turning to Plaintiff's confinement at the Jail, Plaintiff brings a substantive due process

---

[6] Plaintiff was indicted by a grand jury within a few days of being arrested on a felony complaint. (*See* ECF No. 63-6 (criminal complaint dated Sept. 23, 2020); SAC ¶ 11 (Plaintiff's incarceration began Sept. 24, 2020); ECF No. 63-7 (indictment certification dated Sept. 29, 2020).) (I may take judicial notice of these court documents. *See Drew v. City of N.Y.*, No. 18-CV-10557, 2020 WL 3869732, at *1 n.1 (S.D.N.Y. July 9, 2020); *Culpepper v. City of N.Y.*, No. 14-CV-06585, 2018 WL 1918619, at *7 n.4 (S.D.N.Y. Apr. 20, 2018); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . .").) Even "[u]nder New York law a defendant may be indicted by a grand jury even if he was first arraigned on a felony complaint in the local criminal court, and no preliminary hearing is required if an indictment has been returned." *Sain*, 2021 WL 6808294, at *7. Plaintiff thus lacked even a statutory right to a preliminary hearing.

claim and an Eighth Amendment claim in connection with his medical isolation.  Because

Plaintiff was a pretrial detainee at the relevant time, his claims are governed by the Due Process

Clause of the Fourteenth Amendment, which affords protection at least as great as the Eighth

Amendment's.  *See Russell v. Scott*, No. 24-3312, 2026 WL 771245, at \*5 (2d Cir. Mar. 19,

2026).  "A pretrial detainee's claims are evaluated under the Due Process Clause because pretrial

detainees have not been convicted of a crime and thus may not be punished in any manner –

neither cruelly and unusually nor otherwise."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

"Under the Fourteenth Amendment, the proper inquiry is whether the conditions of

confinement amount to punishment of the detainee," *Washington v. Falco*, No. 20-CV-3009,

2021 WL 797658, at \*4 (S.D.N.Y. Mar. 1, 2021), which in turn requires a court to determine

"whether the restriction is imposed for the purpose of punishment or whether it is but an incident

of some other legitimate governmental purpose," *Almighty Supreme Born Allah v. Milling*, 876

F.3d 48, 55 (2d Cir. 2017).  If no intent to punish is present, then the inquiry "generally will turn

on whether an alternative purpose to which the restriction may rationally be connected is

assignable for it, and whether it appears excessive in relation to the alternative purpose

assigned." *Id.*

The government has a legitimate interest in the security of jails and prisons, including the

health and safety of all individuals in their custody.  *See Braithwaite v. Suffolk County*, No. 22-

CV-3750, 2022 WL 16837341, at \*8-9 (E.D.N.Y. Nov. 9, 2022).  A court generally is not to

"inject itself into the day-to-day management of prisons, as the 'operation of a correctional

institution is at best an extraordinarily difficult undertaking.'  Doing so during a national

pandemic would only magnify the difficulties." *Jones v. County of Allegheny*, No. 21-CV-1094,

2022 WL 2806779, at \*6 (W.D. Pa. June 24, 2022) (quoting *Wolff v. McDonnell*, 418 U.S. 539,

22

566 (1974)), *report and recommendation adopted*, 2022 WL 2803111 (W.D. Pa. July 18, 2022).

But even given this "deference in matters of institutional security, such deference does not

relieve officials from the requirements of due process or permit them to institute restrictive

measures on pretrial detainees that are not reasonably related to legitimate governmental

purposes." *Allah*, 876 F.3d at 56.

Plaintiff alleges that he was placed in medical segregation in September or October 2020

after he refused to take a COVID-19 test via nasal swab but was willing to take a blood test,

which he says was an available alternative testing method at the time. (SAC ¶¶ 25-27; Compl. at

4.) Plaintiff then remained in medical segregation after a fourteen-day observation period, even

though he never showed signs of COVID, and subsequently spent up to eight months in medical

segregation. (*See* Compl. at 4; AC at 3; SAC ¶ 30.) Plaintiff further alleges that his cell was six

feet by nine feet and that the segregation led to the worsening of his mental health ailments.

(Compl. at 8.) Plaintiff states that he was told that his request for a blood test was denied due to

cost concerns, (SAC ¶ 26), and alleges that his prolonged placement in medical segregation was

a means to punish him, (*id.* ¶¶ 27, 29; AC at 3).

Plaintiff's allegation that his placement was a means of punishment is not only

conclusory but also implausible. Plaintiff does not point to any statement by anyone at the Jail

suggesting punitive intent, and his apparent contention that the placement must have been

punitive because it followed his refusal of the nasal swab is an example of the *post hoc ergo*

*propter hoc* fallacy, which is not enough to establish a plausible claim. *Freeman v. Town of*

*Irondequoit*, 652 F. Supp. 3d 362, 371 (W.D.N.Y. 2023), *aff'd*, No. 23-112, 2023 WL 7013409

(2d Cir. Oct. 25, 2023) (summary order).[7]  Nor is it plausible that the cost of a blood test prompted his segregation.  The Jail did not incur that cost, so it would have had no reason to punish him for it, and keeping Plaintiff in medical segregation for eight months was likely a more costly measure for the Jail than administering one blood draw.  Plaintiff's claim of punitive intent is the "naked assertion[] devoid of further factual enhancement" condemned by *Iqbal*.  556 U.S. at 678.

In any event, weighing the costs of protective measures – a nonpunitive interest – is certainly appropriate for the Jail's administration in making decisions about how to protect its population during a public health crisis, and is exactly the type of administrative, discretionary call that does not give rise to a due process claim without more.  *See Braithwaite*, 2022 WL 16837341, at *8.  Indeed, Plaintiff's complaints offer a legitimate government interest rationally related to segregation:  that he was being separated for medical reasons related to COVID-19 protocols.  (*See* SAC ¶¶ 21-22.)[8]  The question thus becomes whether Plaintiff's confinement was excessive in relation to that justification.  *See Allah*, 876 F.3d at 55.  Although Plaintiff's isolation lasted longer than a fourteen-day observational hold, which Plaintiff alleges was standard at the Jail at the time, the Court cannot conclude that Plaintiff's medical quarantine was

---

[7] "*Post hoc ergo propter hoc*, translated as 'after therefore resulting from it,' refers to 'the logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential.'"  *Abbey House Media, Inc. v. Apple Inc.*, No. 14-CV-2000, 2016 WL 297720, at *10 n.22 (S.D.N.Y. Jan. 22, 2016) (quoting Black's Law Dictionary (10th ed. 2014)), *aff'd sub nom. Abbey House Media, Inc. v. Simon & Schuster, Inc.*, 869 F.3d 53 (2d Cir. 2017) (*per curiam*).

[8] Indeed, it seems apparent to the Court that a decision not to return Plaintiff to general population following the fourteen-day quarantine was eminently reasonable.  Given how rampant COVID-19 was in 2020 and how easily an inmate in general population could be exposed, and knowing that Plaintiff was refusing to be tested, jail officials could rationally conclude that keeping Plaintiff in medical segregation would avoid the need for frequent disruptive transfers back and forth.

"so extreme that [it] smack[s] of punishment." *Falco*, 2021 WL 797658, at *5. Plaintiff alleges no additional facts about his confinement other than the length of his separation from the general population and the size of his cell. (Compl. at 4, 8.) Plaintiff's additional allegations about "physical deterioration" are conclusory and lack factual support sufficient to infer that the conditions of Plaintiff's segregation rendered his placement excessive. (*See* SAC ¶ 61.) Without more, the Court cannot conclude either that Plaintiff was being punished or that the conditions of his isolation were excessive in relation to the legitimate government interest of protecting the occupants of the Jail from COVID-19.

Decisions about where to "move those who test positive, those who refuse to be vaccinated, those who are more vulnerable to serious complications should they contract COVID-19, and those who recover from COVID-19" are the types of administrative choices in a jail that a court generally should not disturb absent additional allegations. *See Braithwaite*, 2022 WL 16837341, at *8. The decision to separate, and continue to separate, a detainee who refuses to take a COVID test is of the same ilk, and absent any specific allegation plausibly suggesting ill or punitive intent, Plaintiff fails to state a substantive due process claim for punitive conditions of confinement.

Plaintiff's SAC also suggests that he is bringing a claim under a deliberate indifference theory, (SAC ¶ 54), but his allegations are similarly insufficient to state a claim. An official's deliberate indifference to a detainee's conditions of confinement can give rise to a § 1983 claim apart from a claim that the conditions are punitive. *See Darnell*, 849 F.3d at 34 n.12; *Falco*, 2021 WL 797658, at *4. For a pretrial detainee to establish a claim under a deliberate indifference theory, two elements must be met: "an objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due

25

process, and a subjective prong . . . showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. Under the first prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," *id.* at 30, and under the second, he "must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety," *id.* at 35.

Plaintiff's challenge fails on the objective prong. "[T]he proper lens through which to analyze allegedly unconstitutional . . . conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury." *Id.* at 30. There is no bright-line rule on when the conditions are so severe that they meet the objective prong, and the Second Circuit has noted that the inquiry must be "flexible and dependent upon the circumstances." *Id.* at 31. Plaintiff has not alleged sufficient facts to infer that his conditions of confinement would meet the objective prong. Plaintiff's only allegations in his three complaints as to the nature of his confinement that would support his claim are that he was separated from the general population for up to eight months and that his cell was six feet by nine feet. (*See* Compl. at 4, 8.) Plaintiff includes no factual allegations suggesting he was subjected to poor sanitation, lack of exercise, inadequate nutrition, sleep deprivation, extreme temperatures or other conditions that would suggest his confinement objectively posed a serious harm to his health or was a means of punishment. *See Darnell*, 849 F.3d at 32; *see also Milner v. Lamont*, No. 20-CV-1245, 2022 WL 2110971, at *10 (D. Conn. June 9, 2022) (no due process violation in detainee's extended COVID quarantine even when detainee was denied showers, exercise and outside phone calls).

26

He also does not compare the conditions he experienced to those that existed in general population at the time, but "draw[ing] on [my] judicial experience and common sense," *Iqbal*, 556 U.S. at 679, at the height of COVID-19 in 2020, before any vaccine existed, all inmates were subject to distancing and restrictions that were more onerous than in ordinary times.  Plaintiff states in conclusory fashion that his "physical deterioration" was due to "malnutrition" and that he lost "access to adequate medical care," (*see* SAC ¶ 61), but he provides no further information that might support these conclusions.  Plaintiff's allegations concerning a lack of access to the law library, as well as his loss of income and family connections while incarcerated, are not deprivations that can support a claim for deliberate indifference.  *See Darnell*, 849 F.3d at 30 ("[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.").[9]  Without more, Plaintiff's allegations are insufficient to state a substantive due process claim under a deliberate indifference theory.[10]

Accordingly, Plaintiff's substantive due process and Eighth Amendment claims are dismissed.

### E.    Procedural Due Process

Plaintiff raises two allegations sounding in procedural due process:  that (1) Jail administrators failed to respond to his grievance complaints related to his confinement in

---

[9] Plaintiff's allegation that he lost "religious freedoms" first appeared in his AC, (AC at 4), and then was repeated in his SAC, along with the allegation that he lost access to religious services, (SAC ¶ 61), but he never alleged any facts to support these assertions (such as, for example, what religious activities he wished to pursue) that could plausibly state a claim that an independent First Amendment violation occurred.

[10] Nor can Plaintiff meet the subjective prong, for the simple reason that he has not sued, or provided facts about, any individual whose state of mind the Court could assess.

medical segregation and (2) he was given no opportunity for meaningful review of his placement. I will address each in turn.

### 1. Grievances

As to his claim related to Jail administrator's failure to respond to his grievances, Plaintiff fails to plausibly state a § 1983 claim because no federal right is implicated. "Inmate grievance programs created by state or local law are not required by the Constitution and consequently allegations that prison officials violated those procedures do not give rise to a cognizable § 1983 claim." *Vargas v. Renzi*, No. 21-CV-06165, 2021 WL 1022849, at *8 (W.D.N.Y. Mar. 15, 2021); *see Meisel v. Westchester County*, No. 18-CV-7202, 2020 WL 3472500, at *7 (S.D.N.Y. June 25, 2020). Moreover, grievance systems themselves create no liberty interest for people incarcerated at facilities with such procedures in place. *See Gaddy v. Sullivan Cnty. Jail Adm'r & Med. Dep't*, No. 24-CV-4243, 2025 WL 2222659, at *6 (S.D.N.Y. Aug. 4, 2025). Thus, to the extent Plaintiff's procedural due process allegations are premised on the Jail administrator's "failure to respond to Plaintiff's grievances within required timeframes," (SAC ¶ 49; *see* AC at 3), Plaintiff cannot state a § 1983 claim as a matter of law.

### 2. Medical Segregation

Plaintiff also brings a procedural due process claim as to his extended placement in medical segregation. "[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause," *Falco*, 2021 WL 797658, at *7, which includes a liberty interest in not being placed in segregation, *Megginson v. Stukes*, No. 21-CV-10689, 2022 WL 596367, at *3

28

(S.D.N.Y. Feb. 28, 2022).  What process a pretrial detainee is due to protect this liberty interest, however, depends on whether the segregation is imposed for disciplinary reasons or for nonpunitive, administrative reasons.  *Id.*; *Falco*, 2021 WL 797658, at *7.  "[W]ritten notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence" are required for punitive deprivations of pretrial detainee's liberty to accord with the Due Process Clause, but those in administrative segregation before completion of a misconduct investigation need only receive "some notice of the charges against him and an opportunity to present his views." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001); *see Taylor v. Comm'r of N.Y.C. Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009) (summary order).  For a pretrial detainee in administrative segregation, some sort of "meaningful periodic review of his continued detention" is required, including "consider[ation of] new relevant evidence as it becomes available." *Edwards v. Arocho*, 125 F.4th 336, 353 (2d Cir. 2024).  The purpose of periodic review is to ensure that a jail's interest in separating people in custody and confining their liberty "has not grown stale" and that jail administrators are not using segregation as pretext for indefinite confinement. *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017).

Where a pretrial detainee is separated from the rest of the jail population for medical reasons, however, rather than pending review of misconduct, courts have found that, at most, lesser procedures were sufficient to protect a pretrial detainee. *See, e.g.*, *Culpepper v. Toulon*, No. 21-CV-6553, 2023 WL 6460887, at *4 (E.D.N.Y. Oct. 4, 2023) ("Plaintiff's allegation that he was denied due process by placing him in quarantine without a hearing requires little discussion."); *Milner*, 2022 WL 2110971, at *11 ("No court has held that a hearing is required before an inmate is placed in medical quarantine" after a positive COVID test.); *Smallwood-El v.*

29

*Coughlin*, 589 F. Supp. 692, 697-98 (S.D.N.Y. 1984) (no procedural due process violation where detainee had oral notice and opportunity to be heard for continued medical segregation). As previously noted, Plaintiff has not plausibly suggested that his extended medical segregation was meant to punish him, and it is clear from the face of his complaints that his placement clearly was based on COVID-19 protocols. (*See* SAC ¶¶ 21-30.) Plaintiff therefore was due lesser procedural requirements upon his placement.

Plaintiff received the lesser process that detainees in administrative segregation are due. He was notified that he would be placed in isolation due to COVID safety protocols, and he had the opportunity to present his views by refusing and demanding a blood test. *See Smallwood-El*, 589 F. Supp. at 698 (sufficient process from inmate being informed he was being isolated for refusing test and informal opportunity to state his position). It would be absurd to find that Plaintiff's preference for a blood test, rather than nasal swab, gives rise to a constitutional claim for a failure to be heard. *Cf. Palacio v. Ocasio*, No. 02-CV-6726, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) (noting that in the Eighth Amendment deliberate indifference context, disagreement over the proper treatment does not create a constitutional claim so long as the treatment given is adequate), *aff'd sub nom. Palacio v. Pagan*, 345 F. App'x 668 (2d Cir. 2009) (summary order).

Plaintiff also alleges that he did not receive "meaningful review" of his quarantine status, (SAC ¶ 32), but this allegation is conclusory, and even affording Plaintiff the special solicitude that he is due, he has not stated a plausible claim. Plaintiff does not allege that he ever offered the Jail's staff a reason, medical or otherwise, why he could not take a nasal swab test. He also does not allege that he was never offered another opportunity to take a COVID test for the eight months that he stayed in medical confinement, or that he could not have asked for one, nor is any

30

such inference plausible from his allegations, given that Plaintiff alleges comprehensive COVID screening procedures were in place at the facility.  (SAC ¶¶ 22, 28.)  Instead, Plaintiff alleges that at the beginning of his incarceration he requested to test via blood draw, was told at that time that only a nasal swab would be available due to cost concerns, and that he received a blood draw on the day before his release from confinement.  (SAC ¶¶ 25-26, 34-35.)  It is not plausible to infer from these allegations that Plaintiff had no chance to review his status in medical confinement.

Moreover, several district courts within the Second Circuit have found that an incarcerated individual in medical quarantine for refusal to submit to a medical test holds the keys to his release and suffers no procedural due process violation in his continued confinement in medical segregation.  *See, e.g., Smith v. Wright*, No. 06-CV-401, 2011 WL 4902860, at *9 (N.D.N.Y. Aug. 31, 2011) (no due process violation where plaintiff had both notice of the reason for his medical keeplock and the means of ending it), *report and recommendation adopted*, 2011 WL 4458770 (N.D.N.Y. Sept. 23, 2011); *Fox v. Poole*, No. 06-CV-148, 2008 WL 1867939, at *14 (W.D.N.Y. Apr. 24, 2008) (no due process violation where plaintiff "could have shortened this period of isolation by participating earlier in the testing and treatment"); *Rossi v. Goord*, No. 00-CV-1521, 2006 WL 2811505, at *8 (N.D.N.Y. Sept. 28, 2006) (same as *Smith*), *on reconsideration*, 2007 WL 952051 (N.D.N.Y. Mar. 29, 2007); *Smallwood-El*, 589 F. Supp. at 696, 698 (no procedural due process violation where plaintiff was to remain separated from general population, as ordered by medical staff, "until consent [wa]s given" to testing for communicable disease); *cf. May v. Higgins*, No. 20-CV-826, 2020 WL 4919562, at *3 (E.D. Ark. Aug. 7, 2020) ("Plaintiff holds the keys to his isolation cell door.  If he wants out of his isolation cell for recreation and commissary time, he need only have his temperature taken."),

*report and recommendation adopted*, 2020 WL 4905833 (E.D. Ark. Aug. 20, 2020), *appeal dismissed*, No. 20-2854, 2020 WL 8743616 (8th Cir. Oct. 1, 2020).  If, as he contends, he was segregated for failure to take the nasal swab test, Plaintiff could have agreed to do so at any time.

The availability of a blood test is of no moment.  Plaintiff alleges that a blood draw was always an alternative for the Jail's staff to allow him to leave quarantine, but he offers no basis for this belief beyond his having received a blood draw the day before he was released.  (SAC ¶¶ 34-35.)  He further alleges that "established medical protocols at the facility . . . provided for individualized medical assessments and various testing alternatives" and his extended isolation "overrode established medical protocols."  (SAC ¶¶ 28-29.)  Even if this conclusory allegation could plausibly raise the inference that a blood draw was an available alternative means of ending a COVID isolation, Plaintiff's allegation would essentially be that Jail staff failed to follow their own protocols, which does not give rise to a claim under § 1983.  *See Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *4 (S.D.N.Y. Mar. 28, 2019) (failure to follow internal policies does not give rise to constitutional violation) (collecting cases).  Moreover, a jail could have myriad reasons for changing how they screen for communicable diseases, and Plaintiff's speculation that a blood draw to screen for COVID was always an available and acceptable method for the Jail's medical staff to allow Plaintiff, or any other detainee, to leave medical isolation amid a pandemic does not raise a plausible due process claim.  Further, Plaintiff's allegation that he finally received a blood test on his penultimate day of incarceration does not, without more, raise a plausible inference that jail officials provided no opportunity for a review of his status in medical segregation over the course of his confinement.

Due process calls for a "flexible" inquiry into the "procedural protections [that] the particular situation demands."  *Benjamin*, 264 F.3d at 190.  But to find a due process violation

32

based on Plaintiff's allegations would be to find that the Due Process Clause as a matter of law requires that an inmate be allowed his preferred type of diagnostic testing to leave medical isolation. The Court declines to so find.

Accordingly, Plaintiff's procedural due process claims are dismissed.

## IV.    <u>LEAVE TO AMEND</u>

Finally, I consider whether Plaintiff should be granted leave to amend, which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended twice (*see* ECF Nos. 8, 53), after having the benefit of Chief Judge Swain's written order, which addressed deficiencies in Plaintiff's claims, (*see* ECF No. 5), pre-motion letters from Defendants, (*see* ECF Nos. 45, 48), and the discussion at the pre-motion conference, (*see* Minute Entry dated June 26, 2025). Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.");

33

*Williams v. Time Warner Inc.*, No. 09-CV-2962, 2010 WL 846970, at *7-8 (S.D.N.Y. Mar. 3, 2010) (leave to amend properly denied where plaintiff declined to amend after being advised of arguments for dismissal and complaint's deficiencies), *aff'd*, 440 F. App'x 7 (2d Cir. 2011) (summary order); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies."); *Elmore v. Atieh*, No. 23-CV-508, 2024 WL 770768, at *2 (N.D.N.Y. Feb. 26, 2024) (denying leave to amend because "the extension of special solicitude to *pro se* litigants requires only *one* . . . opportunity to amend" and plaintiff "failed to cure the defects despite having been given an adequate notice of them and a reasonable opportunity to cure them") (emphasis in original); *see also Solomon v. Fordham Univ. Admin., Rose Hill Campus*, No. 22-887, 2023 WL 5689712, at *3 (2d Cir. Sept. 5, 2023) (summary order) (leave to amend properly denied where *pro se* plaintiff was permitted to amend at least three times and did not persuasively argue why a fourth amendment should be permitted); *Pottetti v. Educ. Credit Mgmt. Corp.*, No. 19-CV-4479, 2020 WL 5645194, at *7 (E.D.N.Y. Sept. 22, 2020) (no need to grant leave to amend where *pro se* plaintiff "has had multiple opportunities to properly state his claims").

34

Further, Plaintiff has not asked to amend, nor does it appear that he is in possession of facts that would cure the deficiencies identified in this ruling. *See Bank v. Gohealth, LLC*, No. 21-1287, 2022 WL 1132503, at *1 (2d Cir. Apr. 18, 2022) (summary order) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend); *Brown v. N.Y.C. Dep't of Educ.*, No. 20-CV-2424, 2022 WL 4364600, at *4 n.3 (S.D.N.Y. Sept. 21, 2022) (denying leave to amend where *pro se* plaintiff did not provide additional facts to cure identified deficiencies); *see also Todd v. Fields*, No. 20-CV-3608, 2022 WL 596829, at *6 (S.D.N.Y. Feb. 25, 2022) ("While courts should be more lenient when considering a *pro se* party's motion to amend than when considering that of a represented party, leave to amend is properly denied where all indications are that the *pro se* plaintiff will be unable to state a valid claim.").

Accordingly, the Court declines to grant Plaintiff leave to amend *sua sponte*.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motions are granted, and Plaintiff's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the pending

motions, (ECF Nos. 57, 62), and close the case.

**SO ORDERED.**

Dated: April 24, 2026
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.